FILED
2021 Dec-09  PM 03:56
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit A

ELECTRONICALLY FILED
11/4/2021 11:44 AM
31-CV-2021-900518.00
CIRCUIT COURT OF
ETOWAH COUNTY, ALABAMA
CASSANDRA JOHNSON, CLERK

CAUSE NO.____

| | | |
|---|---|---|
| **RICHARD NORTON** | § | |
| | § | |
| *Plaintiff* | § | |
| | § | |
| **v.** | § | **IN THE CIRCUIT COURT OF** |
| | § | |
| **3M COMPANY;** | § | |
| **ARIZANT HEALTHCARE, INC.;** | § | |
| **GADSDEN REGIONAL MEDICAL** | § | |
| **CENTER, LLC;** | § | **ETOWAH COUNTY,** |
| **ANESTHESIA ASSOCIATES, P.A.;** | § | **ALABAMA** |
| **JOSEPH SCOTT RAYBURN, MD;** | § | |
| **WILLIAM T. CARR, CRNA;** | § | |
| **NORTHEAST ORTHOPEDIC CLINIC,** | § | |
| **PC;** | § | |
| **GLENN L. WILSON, MD** | § | |
| | § | |
| *Defendants* | § | |

_____

## PLAINTIFF'S ORIGINAL COMPLAINT

## PARTIES

1.      Plaintiff Richard Norton is an citzen of the State of Alabama and a resident of DeKalb County, Alabama.

2.      Defendant 3M Company ("3M") is a corporation organized and existing under the laws of Delaware, with its principal place of business in Maplewood, Minnesota.  3M is engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, leasing, supplying, selling, marketing, and introducing into interstate commerce, either directly or indirectly, products such as the Bair Hugger.  3M is organized as a foreign corporation with its principal place of business in St. Paul, MN.  3M may be served through its registered agent, Corporation Service Company, Inc. located at 641 South Lawrence Street, Montgomery, AL 36104.

1

3.      Defendant Arizant Healthcare, Inc. ("Arizant") is a corporation organized and existing under the laws of Delaware.  Arizant is a wholly owned subsidiary of 3M and conducts business throughout the United States.  Arizant is organized as a foreign corporation with its principal place of business in Eden Prairie, MN.  Arizant may be served through its registered agent, CT Corporation System located at 2 North Jackson Street, Suite 605, Montgomery, AL 36104.

4.      Defendant Gadsden Regional Medical Center, LLC ("Gadsden Regional") is hospital located in Gadsden, Al but is organized as a Texas limited liability corporation with its principal place of business in Plano, TX.  Gadsden Regional may be served through its registered agent, Corporation Service Company, Inc. located at 641 South Lawrence Street, Montgomery, AL 36104.

5.      Defendant Anesthesia Associates, P.A. ("Anesthesia Associates") is organized as an Alabama professional association with its principal place of business located at 302 North Hood Ave, Gadsden, AL 35902.  Anesthesia Associates may be served at its principal place of business or at PO Box 8305, Gadsden, AL 35902-8305.

6.      Defendant Joseph Scott Rayburn, MD is a resident of Alabama and a member of Defendant Anesthesia Associates.  He may be served at 302 North Hood Ave, Gadsden, AL 35902.

7.      Defendant William T. Carr, CRNA is a resident of Alabama and an employee of Defendant Anesthesia Associates.  He may be served at 302 North Hood Ave, Gadsden, AL 35902.

8.      Defendant Northeast Orthopedic Clinic, PC ("Northeast Ortho") is organized as an Alabama professional corporation with its principal place of business in Gadsden, AL.  Northeast Ortho may be served via its registered agent Dr. Danny R. Sparks at 507 South Fourth Street, Gadsden, AL 35901.

9.      Defendant Glenn L. Wilson, MD is a resident of Alabama who is an employee of Northeast Ortho.  He may be served at  507 South Fourth Street, Gadsden, AL 35901.

## JURISDICTION AND VENUE

10.      This court has jurisdiction over this matter as it is a civil matter in which the amount in controversy exceeds $10,000.  In addition, Etowah County is a proper venue for this matter as it is the county in which a substantial part of the events or omissions giving rise to these claims occurred.

## FACTUAL BACKGROUND

11.      The Bair Hugger consists of a portable heater or blower connected by a flexible hose to a disposable blanket that is placed over (or in some cases under) surgical patients.  The Bair Hugger intakes air from the surrounding area (often from the non-sterile floor of the operating room) and passes it through the intake filter and internal air pathways of the machine and into an outlet hose.  The warm air travels through the distal end hose, which does not have an air filter, and into the blanket, which has different compartments through which the warm air moves.  The warm air exits the blanket through multiple holes over a patient's exposed skin, providing warmth to the patient during surgery.

12.      While warm air accumulates under the surgical drape covering the patient, the air escapes from multiple places.  The escaped air creates airflow and/or convection currents that push against and disrupt the downward airflow of the operating theater.

13.      Scientific studies have shown that as this warmed air rises against the downward airflow in the operating room, it deposits bacteria from the non-sterile portions of the operating theater to the surgical site.

14.     Scientific studies have also shown that the inadequate air filtration system of the Bair Hugger allows pathogenic-carrying cells, including but not limited to isolates of *S aureus*, coagulase-negative *staphylococci* ("CoNS"), and methicillin-resistant *staphylococcus aureus* ("MRSA"), to penetrate the intake filter of the device and colonize inside the device.

15.     Indeed, as the device sits on or near the floor of the operating theater, often directly next to the operating table, it intakes large quantities of desquamated skin cells and other viable microorganisms that have been pushed down to the non-sterile floor of the operating theater.  In some cases, these microorganisms move through the intake filter and attach to the inner pathways of the device; in other cases, they enter through gaps between the filter and the device or between the distal end hose and the device.  Because the internal air path surfaces of the device cannot be easily cleaned or decontaminated, and the operating instructions for the device do not provide a method for cleaning or decontaminating the inside of the device, microorganisms build up and colonize therein.  Without an adequate filtration system at the distal hose outlet, the device releases contaminants into the operating theater and directly onto the surgical site itself.

16.     For over two decades, 3M and Arizant have known that the Bair Hugger emits significant levels of internally generated airborne contaminants into the operating theater and that the exhaust generated thereby creates convective airflow patterns that disrupt the unidirectional airflow of the operating theater, dramatically increasing the risk of infection for patients undergoing lengthy surgeries, especially hip and knee replacement surgeries.

17.     Notwithstanding their knowledge of that risk and the availability of safer alternative designs, 3M and Arizant actively and aggressively marketed the Bair Hugger as safe in both general and orthopedic surgeries.

18.     3M and Arizant also misrepresented that the air filtration system of the Bair Hugger satisfied High Efficiency Particulate Air ("HEPA") standards.

19.     Though 3M and Arizant touted the Bair Hugger as HEPA compliant to healthcare providers and informed the FDA of the same, the Bair Hugger has never met that standard.

20.     Upon information and belief, at some point between 2002 and 2009, 3M and Arizant significantly reduced the efficiency of the Bair Hugger's air filtration system. As a result of that decision, the internal airflow pathways of the Bair Hugger become contaminated with pathogens, including isolates of CoNS, mold, and other bacteria, which incubate and proliferate therein.  And since the defective design of the device does not include an outlet filter—let alone a HEPA-complaint filter, the Bair Hugger releases contaminants into the operating theater and onto the surgical site.

21.     Upon information and belief, 3M and Arizant have been aware of the pathogenic contamination of the internal airflow pathways of the Bair Hugger since at least as early as 2009.

22.     Contemporaneous publication of scientific studies identifying these issues and the availability of alterative designs should have prompted 3M and Arizant to discontinue marketing and selling the Bair Hugger until they could redesign the device to prevent the spread of bacterial contamination.

23.     At a minimum, 3M and Arizant should have warned patients and healthcare providers of the known risk inherent in using the Bair Hugger in orthopedic surgeries.

24.     Instead, amid rising criticism of the Bair Hugger among the medical community, 3M and Arizant callously and with conscious disregard of patient safety chose to amplify their efforts to champion the device and silence critics. In fact, 3M and Arizant have taken every step

imaginable to conceal and discredit peer-reviewed scientific studies that undermine their ability to market the Bair Hugger.

## PLAINTIFF'S SURGICAL BACKGROUND

25.     Plaintiff Richard Norton is a 62 year old resident of Fort Payne, Alabama.  Since 2006, Mr. Norton has owned and operated his own small business, specializing in plumbing services.  Unfortunately, the physical toll of many years of hard work bending down and working on his knees to access plumbing resulted in degeneration of his left knee.  Despite conservative efforts and an arthroscopic attempt at repair, by 2019, his knee was bone on bone and a total knee replacement was recommended by his orthopedic surgeon, Defendant Wilson.

26.     After considering those risks of which he was informed, which did not include any warnings related to the risk of use of a Bair Hugger system, Mr. Norton underwent a left robotic total knee makoplasty with placemet of titanium implants (knee replacement surgery) at Defendant Gasden Regional on November 4, 2019, which was performed by Defedant Wilson, who is employed by Defendant Northeast Ortho.

27.     During that surgery, Defendant Rayburn and Defendant Carr, who are employed by Defendant Anesthesia Associates, provided general anethesia services during which they utilized a forced air warming device believed to be a Bair Hugger, which was provided by Defendant Gadsden Regional.

28.     Defendants Gadsden Regional, Wilson, Northeast Ortho, Russell, Carr, and Anesthesia Associates will be referred to as the "Medical Defendants."

29.     In March of 2020, Mr. Norton began experiencing pain in his left knee with no known cause or visable open wound.  On March 15, 2020, Mr. Norton was seen for his knee pain and started on antibiotics. With progressing symptoms despite antibiotics and fluid removal, he

underwent an excisional debridement on March 19, 2020 during which a large pus filled abscess around the knee was discovered.  Cultures from the abscess and Mr. Norton's blood revealed a methicillin-resistant Staphylococcus aureus (MRSA) infection in his left knee.  MRSA is a type of staph infection that is extraordinarily difficult to treat because of its resistance to antibiotics.

30.     The Medical Defendants, individually and collectively, failed to keep the surgical field sterile in various ways, including but not limited to, the utilization of the Bair Hugger system. The Center for Disease Control and  various other peer reviewed studies have warned that no device that blows air should be used in the operating theater.

31.     Despite this, the Medical Defendants utilized the Bair Hugger system in and failed to keep the surgical field sterile, in violation of their respective standards of care. These violations, individually and collectively, were a proximate cause of the MRSA infection in Mr. Norton's left knee.

32.     After being diagnosed with this life-threatening infection, Mr. Norton began what has become a never-ending-battle to recover from the MRSA infection.  On March 19, 2020, he underwent his first revision of the left knee, during which he was hospitalized for five days. However, the MRSA infection persisted.  Mr. Norton underwent a second revision of the left knee on June 23, 2020.  Thereafter, the prosthesis in left knee was removed on August 24, 2020.  Next, he underwent a third revision of the knee on November 11, 2020 and a subsequent excisional debridement of his knee oin December 30, 2020.

33.     Ultimately Mr. Norton's MRSA infection became so severe that it spread to his lungs, and he was placed on a ventilator and put into a medically induced coma during the peak of the COVID-19 pandemic.

7

34.     Mr. Norton's battle against his MRSA infection continues to this day with the insertion of antibiotic PICC lines, antibiotic spacers, subsequent surgeries, etc.  Additionally, Mr. Norton underwent another total left knee arthroscopy surgery with a new prosthetic, which also subsequently had to be removed and replaced with a rod.  Sadly, he will undergo yet another total left knee arthroscopy surgery with a new prosthetic on November 8, 2021, more than two years after his original surgery.  If this last arthroscopy surgery is not effective, Mr. Norton has been informed that the only other course of action is to amputate his leg.

35.     In sum, Mr. Norton has undergone (and will undergo) more than a dozen different surgeries related to his left knee, was placed on a ventilator in a medically induced coma, and is now permanently disabled, debilitated and disfigured.  The physical and mental pain and suffering Mr. Norton has endured and will continue to endure cannot be overstated.  Moreover, Mr. Norton can no longer work as a plumber and was forced to close his decades-old small business as a result of his injuries.

## **CLAIMS FOR RELIEF**

### **COUNT I – NEGLIGENCE AGAINST 3M AND ARIZANT**

36.     Plaintiff restates the allegations set forth above as if fully rewritten herein.

37.     3M and Arizant designed, developed, tested, manufactured, assembled, inspected, packaged, promoted, marketed, designed, advertised, leased, supplied, and/or sold the Bair Hugger to physicians, healthcare providers, and consumers.

38.     At all times relevant to this action, 3M and Arizant had a duty to perform each of the foregoing functions with reasonable and due care for the safety and well-being of patients, including Plaintiff, who was subjected to the Bair Hugger during his surgery.

39.     3M and Arizant also had a duty to warn all healthcare providers, including Plaintiff's physicians, along with all consumers, including Plaintiff, of the risks, dangers, and adverse side effects associated with the Bair Hugger.

39.     Based on the following non-exhaustive list of particulars, 3M and Arizant knew or reasonably should have known that the Bair Hugger was unreasonably dangerous and defective when used as directed, intended, and designed:

    a.     When hot air from the Bair Hugger escapes and is pushed down to the floor of the operating theater, the hot air picks up bacteria and other pathogens from the floor. When the still warmer air begins to rise after leaving the air current caused by the Bair Hugger, bacteria from the floor of the operating theater are deposited onto the surgical site.

    b.     The Bair Hugger collects bacteria and other infectious pathogens in its internal airflow pathways. These pathogens are expelled from the disposable warming blanket and into the operating theater, dramatically increasing the risk of the patient developing an infection.

40.     3M and Arizant failed to exercise reasonable and due care under the circumstances and therefore breached this duty in the following ways:

    a.     failed to properly and thoroughly test the Bair Hugger before releasing the device to market;

    b.     failed to properly and thoroughly analyze the data resulting from pre-market testing of the Bair Hugger;

    c.     failed to conduct sufficient post-market testing and surveillance of the Bair Hugger;

    d.     3M and Arizant designed, manufactured, marketed, advertised, leased, distributed, and sold the Bair Hugger to consumers, including Plaintiff and his physicians, without an adequate warning of the significant and dangerous risks of the device and without proper instructions to avoid the harm which could foreseeably occur as a result of using the device;

    e.     failed to exercise due care when advertising and promoting the Bair Hugger;

f.      failed to fulfill the standard of care required of a reasonable and prudent manufacturer of surgical products, specifically including products such as the Bair Hugger; and

g.      3M and Arizant negligently continued to manufacture, market, advertise, and distribute the Bair Hugger after Defendants knew or should have known of its adverse effects and/or the availability of safer designs.

41.     As designers, developers, manufacturers, inspectors, advertisers, distributors, suppliers, and sellers of the Bair Hugger, 3M and Arizant had superior knowledge of the Bair Hugger and owed a duty of care to Plaintiff and numerous other customers.

42.     It was foreseeable that 3M and Arizant' actions, omissions, and misrepresentations would lead to severe, permanent, and debilitating injuries to Plaintiff.

43.     As a direct and proximate result of 3M and Arizant' actions, omissions, and misrepresentations, Plaintiff suffered infections, requiring additional surgical procedures to clean the infected areas and/or remove the implant.  Plaintiff has therefore suffered damages and will continue to incur medical expenses as a result of using the Bair Hugger.  Plaintiff has also suffered a diminished capacity for the enjoyment of life, a diminished quality of life, increased risk of premature death, aggravation of preexisting conditions, activation of latent conditions, and other losses and damages.  Plaintiff's direct medical losses and costs include care for hospitalization, physician care, monitoring, treatment, medications, and supplies.  Plaintiff has incurred and will continue to incur mental and physical pain and suffering, along with loss of wages and wage earning capacity.

44.     WHEREFORE, Plaintiff respectfully request that he be granted relief against 3M and Arizant as set forth in the Prayer for Relief.

## COUNT II – STRICT LIABILITY AGAINST 3M AND ARIZANT

45.     Plaintiff restates the allegations set forth above as if fully rewritten herein.

46.     3M and Arizant designed, manufactured, distributed, marketed, leased, supplied, and/or sold the Bair Hugger in a defective and unreasonably dangerous condition.

47.     The propensity of the Bair Hugger to cause convection currents that disrupt the downward airflow of the operating theater makes the device both dangerous when used in the way it is ordinarily used and far more dangerous than reasonably contemplated by those who regularly purchase the device and have ordinary knowledge common to the community as to the characteristics of the device, including Plaintiff and his physicians.

48.     The propensity of the Bair Hugger's internal airflow pathways, including its non-HEPA compliant intake filter, to become contaminated with bacteria and other harmful pathogens also makes the Bair Hugger both dangerous when used in the way it is ordinarily used and far more dangerous than reasonably contemplated by those who regularly purchase the device, including Plaintiff and his physicians.

49.     In addition, the problems associated with cleaning and decontaminating the inside of the device, along with the lack of an outlet filter that could prevent the emission of contaminants into the operating theater, makes the Bair Hugger both dangerous when used in the way it is ordinarily used and far more dangerous than reasonably contemplated by those who regularly purchase the device, including Plaintiff and his physicians.

### A.      Strict Liability – Failure to Warn

50.     3M and Arizant designed, manufactured, inspected, labeled, leased, distributed, marketed, sold, and otherwise released the Bair Hugger into the stream of commerce.

51.     In doing so, 3M and Arizant directly advertised or marketed the Bair Hugger to the FDA, health care professionals, and consumers or persons responsible for consumers.

52.     3M and Arizant thus had a duty to warn of the risks associated with the device.

53.     3M and Arizant failed to adequately warn health care professionals and the public, including Plaintiff and his physicians, about the true risks of the Bair Hugger, including that the device would release contaminated air into the surgical field and that the vented heat from the device would mobilize contaminated air from non-sterile areas of the operating theater to the surgical site, causing infections.

54.     Had 3M and Arizant provided timely and reasonable warnings regarding the safety and efficacy of the Bair Hugger, those warnings would have been heeded and no healthcare professional, including Plaintiff's physicians, would have used the Bair Hugger and no patient or consumer, including Plaintiff, would have allowed use of the device.

55.     3M and Arizant's failure to provide timely and reasonable warnings, instructions, and information regarding the Bair Hugger rendered the device unreasonably dangerous and defective.

56.     As a direct and proximate result of 3M and Arizant's actions, omissions, and misrepresentations, Plaintiff suffered infections, requiring additional surgical procedures to clean the infected areas and/or remove his implants.  Plaintiff has therefore suffered damages and will continue to incur medical expenses as a result of using the Bair Hugger.  Plaintiff has also suffered a diminished capacity for the enjoyment of life, a diminished quality of life, increased risk of premature death, aggravation of preexisting conditions, activation of latent conditions, and other losses and damages.  Plaintiff's direct medical losses and costs include care for hospitalization, physician care, monitoring, treatment, medications, and supplies.  Plaintiff has incurred and will

continue to incur mental and physical pain and suffering, along with loss of wages and wage earning capacity.

57.     WHEREFORE, Plaintiff respectfully request that they be granted relief against 3M and Arizant as set forth in the Prayer for Relief.

### B.     Strict Liability – Defective Design and Manufacture

58.     While engaged in the manufacture and sale of the Bair Hugger, 3M and Arizant manufactured and sold the device to Plaintiff, Plaintiff's physicians, and other consumers within the steam of commerce.

59.     3M and Arizant intended and expected that the Bair Hugger would reach Plaintiff in the condition in which the device was originally manufactured and/or sold.

60.     In view of the utility of the device and the risk involved in its use, the design of the Bair Hugger and/or its component parts makes the product unreasonably dangerous.

61.     At all times relevant to this action, an economically and technologically feasible and safer alternative design existed for the Bair Hugger, including but not limited to airflow-free warming technologies, which in reasonable medical probability would not have impaired the utility of the design and would have prevented or significantly reduced the risk of Plaintiff's infections and subsequent injuries.

62.     The Bair Hugger is thus defective in design as it is not reasonably fit, suitable, or safe for its intended purpose and its foreseeable risks exceed the benefits of its design.

63.     The defective condition of the Bair Hugger made it unreasonably dangerous.

The Bair Hugger was expected to and did reach Plaintiff without substantial change in the condition in which it was designed, manufactured, labeled, marketed, distributed, leased, sold, and otherwise released into the stream of commerce.

64.     Although 3M and Arizant knew or should have known of the risks associated with the use of the Bair Hugger, as well as the defective nature of the device and the availability of safer alternative designs, Defendants have continued to design, manufacture, distribute, market, promote, distribute, lease, supply, and sell the Bair Hugger so as to maximize sales and profits at the expense of public health and safety, in conscious disregard of the foreseeable harm caused by this device.

65.     As a direct and proximate result of 3M and Arizant' actions, omissions, and misrepresentations, Plaintiff suffered infections, requiring additional surgical procedures to clean the infected areas and/or remove his implants.  Plaintiff has therefore suffered damages and will continue to incur medical expenses as a result of using the Bair Hugger.  Plaintiff has also suffered a diminished capacity for the enjoyment of life, a diminished quality of life, increased risk of premature death, aggravation of preexisting conditions, activation of latent conditions, and other losses and damages.  Plaintiff's direct medical losses and costs include care for hospitalization, physician care, monitoring, treatment, medications, and supplies. Plaintiff has incurred and will continue to incur mental and physical pain and suffering, along with loss of wages and wage earning capacity.

66.     WHEREFORE, Plaintiff respectfully request that he be granted relief against Defendants as set forth in the Prayer for Relief.

**COUNT III – BREACH OF EXPRESS WARRANTY AGAINST 3M AND ARIZANT**

67.     3M and Arizant expressly represented to Plaintiff, other consumers, and the medical community that the Bair Hugger was safe and fit for its intended purposes and that it was of merchantable quality, adequately tested, and did not produce negative side effects.

14

68.     Although Plaintiff, other consumers, and the medical community relied upon 3M and Arizant' express representations, as set forth above, the Bair Hugger does not conform to any of those representations because the device is not safe and causes serious and deleterious side effects, including severe and permanent injuries, to innocent consumers.

69.     At all relevant times, the Bair Hugger did not perform as safely as an ordinary consumer would expect or when used as intended or in a reasonably foreseeable manner.

70.     Plaintiff and his physicians, by the use of reasonable care, could not have discovered that 3M and Arizant breached their warranty or the danger in using the Bair Hugger.

71.     As a direct and proximate result of 3M and Arizant' actions, omissions, and misrepresentations, Plaintiff suffered infections, requiring additional surgical procedures to clean the infected areas and/or remove his implants.  Plaintiff has therefore suffered damages and will continue to incur medical expenses as a result of using the Bair Hugger.  Plaintiff has also suffered a diminished capacity for the enjoyment of life, a diminished quality of life, increased risk of premature death, aggravation of preexisting conditions, activation of latent conditions, and other losses and damages. Plaintiff's direct medical losses and costs include care for hospitalization, physician care, monitoring, treatment, medications, and supplies. Plaintiff has incurred and will continue to incur mental and physical pain and suffering, along with loss of wages and wage earning capacity.

72.     WHEREFORE, Plaintiff respectfully requests that he be granted relief against Defendants as set forth in the Prayer for Relief.

**COUNT IV – BREACH OF IMPLIED WARRANTY AGAINST 3M AND ARIZANT**

73.     3M and Arizant designed, manufactured, inspected, labeled, leased, distributed, marketed, sold, and other otherwise released the Bair Hugger into the stream of commerce.

74.     3M and Arizant knew of the use for which the Bair Hugger was intended and impliedly warranted the product to be of merchantable quality and safe and fit for such use.

75.     3M and Arizant were aware that consumers, including Plaintiff, would use the Bair Hugger for treatment in conjunction with orthopedic surgical procedures.

76.     Plaintiff was in privity with 3M and Arizant at all relevant times.

77.     The Bair Hugger was expected to reach and did in fact reach consumers, including Plaintiff, without substantial change in the condition in which the device was originally designed, manufactured, and sold by 3M and Arizant.

78.     3M and Arizant represented through their labeling, advertising, marketing materials, presentations, publications, and regulatory submissions that the Bair Hugger was safe and, upon information and belief, fraudulently withheld and concealed information about the substantial risks of serious injury associated with using the Bair Hugger.

79.     3M and Arizant represented that the Bair Hugger was safe and/or safer than other alternative warming devices and, upon information and belief, fraudulently concealed information demonstrating that the Bair Hugger was less safe than alternative products.

80.     3M and Arizant represented that the Bair Hugger was more efficacious than other alternative devices and, upon information and belief, fraudulently concealed information regarding the true efficacy of the device.

81.     In reliance upon 3M and Arizant's implied warranties, Plaintiff and his physicians used the Bair Hugger as prescribed and in the foreseeable manner normally intended, recommended, promoted, and marketed by 3M and Arizant.

82.     Plaintiff, other consumers, and the medical community also reasonably relied upon the judgment and sensibility of the 3M and Arizant to sell the Bair Hugger only if the product was of merchantable quality and safe and fit for its intended use.

83.     In violation of the following statutes, 3M and Arizant breached their implied warranty to Plaintiff in that the Bair Hugger was not adequately tested and was not of merchantable quality, safe, or fit for its foreseeable and reasonably intended use:

       a.     Ala. Code §§ 7-2-314, et seq.;

       b.     Minn. Stat. Ann. §§ 336.2-314, et seq.;

84.     Plaintiff and his physicians, by the use of reasonable care, could not have discovered that 3M and Arizant breached their warranty or the danger in using the Bair Hugger.

85.     As a direct and proximate result of 3M and Arizant's actions, omissions, and misrepresentations, Plaintiff suffered infections, requiring additional surgical procedures to clean the infected areas and/or remove his implants.  Plaintiff has therefore suffered damages and will continue to incur medical expenses as a result of using the Bair Hugger.  Plaintiff has also suffered a diminished capacity for the enjoyment of life, a diminished quality of life, increased risk of premature death, aggravation of preexisting conditions, activation of latent conditions, and other losses and damages. Plaintiff's direct medical losses and costs include care for hospitalization, physician care, monitoring, treatment, medications, and supplies. Plaintiff has incurred and will continue to incur mental and physical pain and suffering, along with loss of wages and wage earning capacity.

86.     WHEREFORE, Plaintiff respectfully request that he be granted relief against Defendants as set forth in the Prayer for Relief.

### COUNT V – VIOLATION OF THE MINNESOTA
### PREVENTION OF CONSUMER FRAUD ACT
### AGAINST 3M AND ARIZANT

87.     The Minnesota Prevention of Consumer Fraud Act, Minn. Stat. § 325F.69, subd. 1, makes it unlawful for any "person" to engage in fraud or to make "false pretense[s], false promise[s], misrepresentation[s], misleading statement[s] or deceptive practices, with intent that others rely thereon in connection with the sale of any merchandise."

88.     The Bair Hugger qualifies as "merchandise" within the meaning of the Minnesota Prevention of Consumer Fraud Act, Minn. Stat. § 325F.68, subd. 2.

89.     3M and Arizant qualify as "persons" within the meaning of the Minnesota Prevention of Consumer Fraud Act, Minn. Stat. § 325F.68, subd. 3.

90.     As previously alleged, 3M and Arizant acted with, used, or employed fraud, false pretense, false promise, misrepresentation, misleading statements, and/or other deceptive practices with the intent that consumers, including Plaintiff and/or his physicians, rely on said statements or actions in connection with the sale of the Bair Hugger.

91.     Specifically, 3M and Arizant violated § 325F.69 through the following:

    a.      Representing through statements and advertisements that the Bair Hugger has approval, characteristics, uses, or benefits that it does not have;

    b.      Representing through statements and advertisements that the Bair Hugger and its filtration system is of a particular standard, quality, or grade when it differs materially from that representation;

    c.      Representing through statements and advertisements that the Bair Hugger has uses, benefits, or characteristics that have been otherwise proven incorrect; and

18

      c.     Falsely stating, knowingly or with reason to know, that services or repairs to the Bair Hugger are not needed.

92.    Upon information and belief, 3M and Arizant knew that these representations were false when they made them, thus intending to defraud Plaintiff by inducing him and his physicians to purchase the Bair Hugger.

93.    Plaintiff and his physicians were induced by those misrepresentations, causing them to purchase the Bair Huger instead of safer alternative warming devices.

94.    As a direct and proximate result of 3M and Arizant's actions, omissions, and misrepresentations, Plaintiff suffered infections, requiring additional surgical procedures to clean the infected areas and/or remove his implants.  Plaintiff has therefore suffered damages and will continue to incur medical expenses as a result of using the Bair Hugger.  Plaintiff has also suffered a diminished capacity for the enjoyment of life, a diminished quality of life, increased risk of premature death, aggravation of preexisting conditions, activation of latent conditions, and other losses and damages. Plaintiff's direct medical losses and costs include care for hospitalization, physician care, monitoring, treatment, medications, and supplies. Plaintiff has incurred and will continue to incur mental and physical pain and suffering, along with loss of wages and wage earning capacity.

95.    Where, as here, Plaintiff's claims inure to the public benefit, Minnesota's private-attorney general statute, Minn. Stat. § 8.31, allows Plaintiff to bring a civil action to recover damages, together with costs and disbursements, including attorneys' fees.

96.    WHEREFORE, by reason of such violation and pursuant to Minn. Stat. § 8.31, subd. 3a, and § 325F.67, Plaintiff are entitled to recover all of the monies paid for the product; to be compensated for the cost of the medical care arising out of the use of the product; and to recover any and all consequential damages recoverable under the law including but not limited to both past

and future medical expenses; past wage loss; loss of future earning capacity; and, past and future pain, suffering, disability, and emotional distress. Plaintiff is entitled to seek compensatory damages, attorneys' fees, injunctive and equitable relief, and other remedies as determined by the Court pursuant to Minn. Stat. §§ 8.31, 325F.67.

### COUNT VI – CONSUMER FRAUD AND/OR UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW AGAINST 3M AND ARIZANT

97.     Plaintiff herein brings a cause of action for consumer fraud and/or unfair and deceptive trade practices under Ala. Code §§ 8-19-1, et seq applicable state law.

98.     Plaintiff purchased and used the Bair Hugger and suffered ascertainable losses as a result of Defendants' actions in violation of these consumer protection laws.

99.     Had 3M and Arizant not engaged in the deceptive conduct described herein, neither Plaintiff nor his physicians would have purchased and/or paid for the Bair Hugger; nor would Plaintiff have incurred related medical costs and injuries from using the device.

100.    3M and Arizant engaged in wrongful conduct while at the same time obtaining, under false pretenses, monies from Plaintiff and/or Plaintiff's physicians for the device that would not have been paid had 3M and Arizant not engaged in unfair and deceptive conduct.

101.    Unfair methods of competition or deceptive acts or practices that were proscribed by law include the following:

a.      Representing that goods or services have approval, characteristics, ingredients, uses benefits or quantities that they do not have;

b.      Advertising goods or services with the intent not to sell them as advertised; and

d.      Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or misunderstanding.

102.    Plaintiff was injured by the cumulative and indivisible nature of 3M and Arizant's conduct.  Each aspect of 3M and Arizant's conduct was intended to artificially create sales of the Bair Hugger.

103.    On information and belief, 3M and Arizant had actual knowledge of the defective and dangerous condition of the Bair Hugger and failed to take any action to cure those conditions.

104.    Plaintiff and the medical community relied upon 3M and Arizant' misrepresentations and omissions in determining which patient warming device to use.

105.    By reason of the unlawful acts engaged in by 3M and Arizant, and as a direct and proximate result thereof, Plaintiff has sustained economic losses and other damages and are entitled to statutory and compensatory damages in an amount to be proven at trial.

106.    WHEREFORE, Plaintiff request that he be granted relief against Defendants as set forth in the Prayer for Relief and as permitted by the aforementioned laws.

### COUNT VII – NEGLIGENCE AGAINST MEDICAL DEFENDANTS

107.    Plaintiff restates the allegations set forth above as if fully rewritten herein.

108.    On November 4, 2019, Plaintiff underwent a left robotic total knee makoplasty with placemet of titanium implants (knee replacement surgery) at Defendant Gasden Regional Medical Center on November 4, 2019, which was performed by Defedant Wilson, who is employed by Defendant Northeast Ortho.

109.    During that surgery, Defendant Rayburn and Defendant Carr, who are employed by Defendant Anesthesia Associates, provided general anethesia services, during which they utilized a forced air warming device believed to be a Bair Hugger, which was provided by Defendant Gadsden Regional.

110.   In March of 2020, Mr. Norton began experiencing pain in his left knee with no known cause or visable open wound.  On March 15, 2020, Mr. Norton was seen for his knee pain and started on antibiotics. With progressing symptoms despite antibiotics and fluid removal, he underwent an excisional debridement on March 19, 2020 during which a large pus filled abscess around the knee was discovered.  Cultures from the abscess and Mr. Norton's blood revelaed a methicillin-resistant staphylococcus aureus (MRSA) infection in his left knee that had infiltrated his bloodstream.  MRSA is a type of staph infection that is extraordinarily difficult to treat because of its resistance to antibiotics.

111.   At all times the Medical Defendants had a duty to Plaintiff to perform their services in accordance with the applicable standards of care for their respective specialties, including to keep the surgical field sterile.

112.   On November 4, 2019, the Medical Defendants, individually and collectively, failed to keep the surgical field sterile at Gadsden Regional in various ways, including but not limited to, utilization of the Bair Hugger system.  The Center for Disease Control and  and various other peer reviewed studies have warned that no device that blows air should be used in the operating theater.  Despite this, the Medical Defendants utilized the Bair Hugger system and failed to keep the surgical filed sterile, in violation of their respective standards of care.

113.   This breach of their respective standards of was a proximate cause of the MRSA infection in Mr. Norton's left knee.

114.   After being diagnosed with this life-threatening infection, Mr. Norton began what has become a never-ending-battle to recover from the MRSA infection.  He has undergone (and will undergo) more than a dozen different surgeries related to his left knee, was placed on a ventilator in a medically induced coma, and is now permanently disabled, debilitated, and

disfigured.  The physical and mental pain and suffering Mr. Norton has endured and will continue to endure cannot be overstated.  Moreover, Mr. Norton can no longer work as a plumber being premanently disable and was forced to close his decades-old small business as a result of his injuries.

115.    As a direct and proximate result of the Medical Dendants' actions and omissions, collectively and individually, Plaintiff suffered infections, requiring additional surgical procedures to clean the infected areas and/or remove the implant.  Plaintiff has therefore suffered damages and will continue to incur medical expenses as a result of using the use of the Bair Hugger during his surgery and the failure of the Medical Defendants to keep the medical field sterile.

116.    Plaintiff has also suffered a diminished capacity for the enjoyment of life, a diminished quality of life, increased risk of premature death, aggravation of preexisting conditions, activation of latent conditions, and other losses and damages.  Plaintiff's direct medical losses and costs include care for hospitalization, physician care, monitoring, treatment, medications, and supplies.  Plaintiff has incurred and will continue to incur mental and physical pain and suffering, along with loss of wages and wage earning capacity.

117.    WHEREFORE, Plaintiff respectfully request that he be granted relief against the Medical Defendants as set forth in the Prayer for Relief.

## **PRAYER FOR RELIEF**

118.    For the foregoing reasons, Plaintff Mr. Russell Norton requests that Defendants be cited to appear and answer the allegations set forth in this complaint, and that upon final hearing, Plaintiff be awarded a judgment against Defendants for all damages, including but not limited to past and future medical expenses, past and future pain and suffering, past and future mental anguish, disfigurement, loss of quality of life damages, past and future lost wages, as well as all

costs of court, prejudgment and post-judgment interest at the highest legal rate provided for by law, and such other and further relief at law or in equity to which Mr. Norton may be justly entitled.

## JURY DEMAND

119.    Plaintff hereby demands a trial by jury pursuant to Alabama Rule of Civil Procedure 38 for all issues so triable.

Respectfully submitted,

**WALSTON LEGAL GROUP, PC**

By: _____
        Clifford H. Walston
        Alabama Attorney Number WAL181
        cliff@walstonlegal.com
        1600 Post Oak Blvd., Suite 600
        Houston, TX 77056
        (866) 972-2272 (office)
        (713) 299-0651 (cell)
**ATTORNEY FOR PLAINTIFF**